**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF MONTANA**

**(Missoula Division)**

FILED

APR 30 2018

Clerk, U.S. Courts
District Of Montana
Missoula Division

UNITED STATES OF AMERICA;
STATE OF MONTANA
*ex rel.*
[UNDER SEAL]

Relator

Civil Action No.

**TO BE FILED IN CAMERA
AND UNDER SEAL**

vs.

**DO NOT PUT IN PRESS BOX**

**DO NOT ENTER ON PACER**

[UNDER SEAL]

Defendants.

**DOCUMENT TO BE KEPT UNDER SEAL**

Paul Odegaard, Esq.
Odegaard Braukmann Law, PLLC
1601 Lewis Avenue, Suite 101
Billings, Montana
59102
(406) 640-4441
paul@oblawmt.com

1

Lead Counsel
Bryan A. Vroon, Esq. (Motion for *Pro Hac* Admission to be filed)
Georgia Bar No. 729086
Law Offices of Bryan A. Vroon, LLC
1380 West Paces Ferry Road Suite 2270
Atlanta Georgia 30327
(404) 441-9806
bryanvroon@gmail.com

Edward D. Robertson, Jr. (Motion for *Pro Hac* Admission to be filed)
Bartimus, Frickleton & Robertston
715 Swifts Highway
Jefferson City, MO. 65109
573-659-4454
chiprob@earthlink.net

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF MONTANA

### (Missoula Division)

UNITED STATES OF AMERICA;
STATE OF MONTANA
*ex rel.*
JON MOHATT

CASE NO.

Relator

**TO BE FILED IN
CAMERA AND
UNDER SEAL**

vs.

DO NOT PUT IN PRESS BOX

DO NOT ENTER ON PACER

HEALTHCENTER NORTHWEST, LLC;
FLATHEAD PHYSICIANS GROUP, LLC;
NORTHWEST HORIZONS, LLC;
NORTHWEST ORTHOPEDICS & SPORTS MEDICINE, LLC;
APPLIED HEALTH SERVICES, INC.;
AND JOHN DOES 1-100

Defendants.

### RELATOR'S COMPLAINT UNDER FEDERAL FALSE CLAIMS ACT AND MONTANA FALSE CLAIMS ACT

3

**Introduction** ..................................................................................5

**Parties**.........................................................................................10

**Jurisdiction and Venue**................................................................12

**The Physician Investment Arrangement Violated *Stark* Laws**...............13

**HealthCenter Has Overpaid Employed Gynecological Surgeons Based on Referrals**.....................................................................................21

**Defendants' Liability for Penalties Under the *Stark* Laws** .....................29

**Introduction to the Anti-Kickback Statute**.................................................30

**Defendants Participated in Conspiracy to Reward Physicians for Referrals in Violation of *Stark* Laws and the AKS** ...................................33

**Compliance with *Stark* Laws and AKS Was Mandatory Condition of Federal and State Payments**.........................................................................48

    **Compliance with *Stark* Laws and AKS Was Mandatory Condition of Federal Medicare Payments** ............................................................48

    **Compliance with *Stark* Laws and AKS Was Mandatory Condition of Federal-State Medicaid Payments**..............................................................51

**The Federal False Claims Act and Montana False Claims Act**...............52

**Count I--- Causing False Claims for Payment** ............................................55

**Count II--- False Statements** ........................................................................57

**Count III--- Conspiring to Submit False Claims** ........................................59

**Count IV---Submission of Express and Implied False Certifications**....60

**Count V---Knowingly Causing and Retaining Overpayments**................61

**Count VI--- False Record to Avoid an Obligation to Refund**...................63

**Prayers for Relief** .........................................................................................64

**Certificate of Service**...................................................................................65

## Introduction

1. Under the Federal False Claims Act ("FCA"), 31 U.S.C. § 3729 *et seq.*, and the Montana False Claims Act ("MFCA"), Mont. Code Ann. § 17-8-403 *et seq.*, Relator Jon Mohatt states his Complaint against Defendants HealthCenter Northwest, LLC ("HealthCenter"), Flathead Physicians Group, LLC, Northwest Horizons, LLC, Northwest Orthopedics & Sports Medicine, LLC ("NOSM"), Applied Health Services, Inc. and John Does 1-100 filed under seal with the Court as follows.

2. Relator Jon Mohatt is the Chief Financial Officer (CFO) for the Physician Network at Kalispell Regional Healthcare System ("KRHS" or "KRH"). KRHS and Kalispell Regional Medical Center ("KRMC") have engaged in a longstanding scheme to reward employed physicians for referrals. KRHS and KRMC have entered into a handshake settlement in principle with the United States Department of Justice concerning its compensation of certain employed physicians. The Defendants to this action are not included in the pending settlement. This action addresses distinct and separate illegal physician investment arrangements and schemes at HealthCenter to reward physicians for patient referrals.

3. HealthCenter is a general acute care hospital with services that include diagnostic x-ray imaging, ultrasound, computerized tomography (CT), mammography, magnetic resonance imaging (MRI), surgical services, orthopedic procedures, inpatient rehabilitation and physical therapy, gynecological care and surgeries, plastic and cosmetic surgery, imaging services, gastrointestinal care and procedures, and pain management. HealthCenter is located on the KRHS campus in Kalispell, Montana.

4. HealthCenter is owned 60.1 percent by Northwest Horizons, LLC (a wholly-owned subsidiary of KRHS) and 39.9 percent by Flathead Physicians Group, LLC, a group of over 50 investor physicians in the Kalispell region.

5. Rather than working to generate business by simply demonstrating high quality services, the Defendants implemented an illegal investment arrangement with physicians who were financially incentivized to make referrals to HealthCenter. Each year the investor physicians have received significant distributions of profits from HealthCenter. In FY (fiscal year) 2018 through February, HealthCenter had a profit of $16.48 million with distributions of $5.59 million to the investor physicians. In FY 2017, HealthCenter had a profit of $13.73 million with distributions of $5.15 million to the investor physicians. In FY 2016, HealthCenter had a profit of $14.29 million with distributions of $5.06 million to the investor physicians.

6

In FY 2015, HealthCenter had a profit of $15.65 million with distributions of $4.71 million to the investor physicians. In FY 2014, HealthCenter had a profit of $12.83 million with distributions of $4.11 million to the investor physicians.

6.     HealthCenter also operates the MRI/CT Department at KRHS and owns 49 percent of that Department. HealthCenter's investor physicians have profited from each of their referrals to HealthCenter and/or the MRI/CT Department at KRHMC for magnetic resonance imaging (MRI) studies, computerized tomography (CT) scans, and x-rays. The profit distributions from that arrangement have totaled approximately $5 million each year to HealthCenter in the previous 3 years and the investor physicians at HealthCenter have shared in these distributions.

7.     In the past five years, the investor physicians have received approximately $24.6 million in profit distributions from HealthCenter. A substantial part of these profits arose from the investor physicians referring Medicare and Medicaid patients to HealthCenter. Over the last six years, the investor physicians have referred thousands of Medicare and Medicaid patients to HealthCenter for surgical procedures, diagnostic imaging, rehabilitation and various medical services listed above.

8.     HealthCenter's billings to federal and state health care programs have

been substantial with $32.7 million in Medicare charges in FY 2014 and $4.7 million in Medicaid charges. The numbers increased in FY 2015 with approximately $40 million in Medicare charges and $6 million in Medicaid charges.

9.    For years HealthCenter has also paid significant lease payments for use of the land and building to Flathead Hospital Development Company, LLC that is owned 51 percent by Northwest Horizons, LLC and 49 percent by individual physician investors. The individual physician investors in Flathead Hospital Development Company have included many physicians who have referred thousands of Medicare and Medicaid patients to HealthCenter for surgical procedures, diagnostic imaging, rehabilitation and various medical services listed above offered at HealthCenter.

10.    The *Stark* laws are intended to prevent overutilization of services by physicians who stand to profit from referring patients to facilities or entities in which they have a financial interest. The *Stark* statute prohibits a physician from making a referral to an entity, such as a hospital, with which he or she has a financial relationship, for the furnishing of designated health services. 42 U.S.C. §1395nn(a)(1). If the physician makes such a referral, the hospital may not submit a bill for reimbursement to Medicare or Medicaid. 42 U.S.C. §1395nn(a)(1)(B). Similarly, the government may not

8

make any payment for a designated health service provided in violation of *Stark* laws. 42 U.S.C. §1395nn(g)(1).

11.     The Anti-Kickback Statute ("AKS") prohibits a healthcare provider from offering or paying "any remuneration…directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person to…refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program."  42 U.S.C. § 1320a-7b(b). The OIG Anti-Kickback Provisions, 56 Fed. Reg. 35952, 35958 (1991), define "remuneration" as "anything of value in any form whatsoever."

12.     This case presents multiple violations of federal *Stark* laws and the AKS committed by the Defendants. First, Defendants orchestrated illegal investment arrangements for physicians who were induced and rewarded to refer patients to HealthCenter while KRHS's wholly owned subsidiary, Northwest Horizons, received 60.1 percent of the HealthCenter's profits each year and the investor physicians received 39.9 percent each year. The investment arrangement as operated by Defendants violated federal *Stark* laws. Secondly, HealthCenter excessively paid five employed gynecological surgeons based in part on the value of their referrals in violation of *Stark* laws. Third, Defendants to this action conspired and participated in a scheme

9

to induce and reward physicians for referrals in violation of *Stark* laws and the AKS.

13.   This *qui tam* case is brought against Defendants for knowingly defrauding the federal government in connection with Medicare, Medicaid, TRICARE, and other federal health care programs and the Montana state government in connection with the Medicaid Program.

14.   Under the federal False Claims Act and the Montana False Claims Act, on behalf of the United States and the State of Montana, Relator Jon Mohatt seeks to recover all available damages, civil penalties, and other relief arising from Defendants' violations of *Stark* laws and conspiracy to violate *Stark* laws and the AKS as described in this Complaint.

## Parties

15.   Relator Jon Mohatt is the Chief Financial Officer (CFO) for the Physician Network at Kalispell Regional Healthcare in Kalispell, Montana. He has held this position since April 14th, 2014. KRH Physician Network operates under the corporate umbrella and control of Kalispell Regional Healthcare System ("KRHS").

16.   At KRH Physician Network, Mohatt manages the financial operations for over 46 medical practices consisting of over 220 medical providers and $100 million in net revenues.

10

17. Through his work and experience, Mohatt has direct, detailed, and personal knowledge that Defendants have violated federal *Stark* laws and the AKS as described in detail below.

18. HealthCenter is a general acute care hospital owned 60.1 percent by Northwest Horizons, LLC and 39.9 percent by Flathead Physician Group, LLC.

19. Defendant Northwest Horizons, LLC is a wholly owned subsidiary of KRHS. Each year, Northwest Horizons has received approximately 60.1 percent of HealthCenter's profits.

20. Defendant Flathead Physicians Group, LLC is composed of over 50 active physicians in the Kalispell region. Flathead Physicians Group owns 39.9 percent of HealthCenter. Each year approximately 39.9 percent of the HealthCenter profits are distributed to the individual physicians of Flathead Physicians Group.

21. Defendant Northwest Orthopedics and Sports Medicine, LLC ("NOSM") is an orthopedic physician group practice that is owned 51 percent by Defendant Applied Health Services, a for-profit wholly-owned subsidiary of KRHS, and 49 percent by HealthCenter. Certain NOSM orthopedic surgeons have been investors in HealthCenter, they have performed extensive surgical procedures on Medicare and Medicaid patients

11

at HealthCenter that generated substantial ancillary revenues to HealthCenter, and they have referred thousands of Medicare and Medicaid patients to HealthCenter from which they have profited as investors.

## Jurisdiction and Venue

22. This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1331, 28 U.S.C. § 1367, and 31 U.S.C. § 3732, the latter of which specifically confers jurisdiction on this Court for actions brought under 31 U.S.C. §§ 3729 and 3730.

23. Personal jurisdiction and venue are proper in this District under 28 U.S.C. §§ 1391(b) and 1395(a) and 31 U.S.C. § 3732(a), as Defendants can be found, reside, transact business, or otherwise engaged in the illegal conduct at issue within the District.

24. This action arises under the provisions of Title 31 U.S.C. § 3729, *et seq*, popularly known as the False Claims Act which provides that the United States District Courts shall have exclusive jurisdiction over actions brought under that Act.

25. Section 3732(a) of the federal False Claims Act provides, "Any action under section 3730 may be brought in any judicial district in which the defendant or, in the case of multiple defendants, any one defendant can be found, resides, transacts business, or in which any act proscribed by

section 3729 occurred."

26. Relator has filed this action within the statute of limitations under both the federal False Claims Act and the Montana False Claims Act. The limitations period is the later of: (1) 6 years after the date on which the violation is committed; or (2) 3 years after the date when the material facts giving rise to the cause of action are known or reasonably should have been known by the official responsible for acting on the FCA violations. *See* Mont. Code Ann. § 17-8-404; 31 U.S.C. § 3731(b).

27. Prior to filing this case, Mohatt, through his counsel, delivered a draft copy of the Complaint and his written disclosures of substantially all material evidence and information in his possession to the United States Department of Justice, the United States Attorney's Office for the District of Montana, and the State of Montana Attorney General's Office.

### The Physician Investment Arrangement Violated *Stark* Laws

28. Federal *Stark* laws prohibit an entity from billing federal health care programs for designated health services (DHS) referred by a physician who has a financial relationship (ownership, investment, or compensation) with the entity, unless an exception applies. *See* 42 U.S.C. 1395nn. *Stark* laws prohibit the entity from presenting or causing to be presented claims to

13

Medicare or Medicaid for those referred services.[1]

29.     Congress enacted the *Stark* Statute in two parts, commonly known as *Stark I* and *Stark II.* Enacted in 1989, *Stark I* applied to referrals of Medicare patients for clinical laboratory services made on or after January 1, 1992 by physicians with a prohibited financial relationship with the clinical lab provider. *See* Omnibus Budget Reconciliation Act of 1989, P.L. 101-239, § 6204.

30.     In 1993, Congress extended the *Stark* Statute (*Stark II*) to referrals for ten additional designated health services. *See* Omnibus Reconciliation Act of 1993, P.L. 103-66, § 13562, Social Security Act Amendments of 1994, P.L. 103-432, § 152. As of January 1, 1995, *Stark II* applied to patient referrals by physicians with a prohibited financial relationship for the following ten additional "designated health services": (1) inpatient and outpatient hospital services; (2) physical therapy; (3) occupational therapy; (4) radiology; (5) radiation therapy (services and supplies); (6) durable medical equipment and

---

[1] The Federal *Stark* Law "was enacted to address over-utilization, anti-competitive behavior, and other abuses of health care services that occur when physicians have financial relationships with certain ancillary service entities to which they refer Medicare or Medicaid patients." 69 Federal Register 16124 (March 26, 2004). "The approach taken by the Congress in enacting section 1877 of the Act is preventive because it essentially prohibits many financial arrangements between physicians and entities providing DHS." 66 Federal Register 859. "Specifically, Section 1877 of the Act imposes a blanket prohibition on the submission of Medicare claims (and payment to the States of FFP under the Medicaid program) for certain DHS when the service provider has a financial relationship with the referring physician, unless the financial relationship fits into one of several relatively specific exceptions." *Id.*

supplies; (7) parenteral and enteral nutrients, equipment and supplies; (8) prosthetics orthotics, and prosthetic devices and supplies; (9) outpatient prescription drugs; and (10) home health services. *See* 42 U.S.C. § 1395nn(h)(6).

31. The definition of "designated health services" includes "radiology." *See* 42 U.S.C. § 1395nn(h)(6). "Radiology" is defined to include "magnetic resonance imaging, computerized axial tomography scans, and ultrasound devices." *See* 42 U.S.C. § 1395nn(h)(6)(D).

32. For at least the last six years, HealthCenter has provided extensive "designated health services" to patients insured by federal health care programs, including inpatient and outpatient hospital services, physical therapy, occupational therapy, and radiology. A substantial portion of such "designated health services" arose from referrals of Medicare and Medicaid patients by physicians who were investors in HealthCenter.

33. Under the *Stark* laws, prohibited "financial relationships" are divided into two categories: (1) "ownership and investment interests," 42 U.S.C. § 1395nn (c), (d), and "compensation arrangements." 42 U.S.C. § 1395nn (b), (e).

34. Ownership and investment interests include "stock, stock options...partnership shares, limited liability company memberships, as well

as loans, bonds, or other financial instruments that are secured" by an entity's property or its revenue. 42 C.F.R. § 411.354(b)(1).

35.     The *Stark* laws broadly define "compensation arrangements" to include any arrangement involving "remuneration" paid by an entity to a referring physician "directly or indirectly, overtly or covertly, in cash or in kind." 42 U.S.C. § 1395nn (a)(2)(B), (h)(1); 42 C.F.R. § 411.354(c).

36.     The *Stark* laws provide that if a physician has a financial relationship with an entity, then the "entity may not present or cause to be presented a claim under this subchapter or bill to any individual, third party payor, or other entity for designated health services furnished pursuant to a referral prohibited under sub paragraph (A)." 42 U.S.C. § 1395nn (a)(1).

37.     The *Stark* Statute defines "referral" as "the request or establishment of a plan of care by a physician which includes the provision of designated health services." 42 U.S.C. § 1395nn (h) (5) (A).

38.     The accompanying regulations applying *Stark* laws also broadly define "referral" as, among other things, "a request by a physician that includes the provision of any designated health service for which payment may be made under Medicare, the establishment of a plan of care by a physician that includes the provision of such a designated health service, or the certifying or recertifying of the need for such a designated health service

16

. . . ." 42 C.F.R § 411.351. A referring physician is defined in the same regulation as "a physician who makes a referral as defined in this section or who directs another person or entity to make a referral or who controls referrals made to another person or entity." *Id.*

39.    In addition to prohibiting providers from submitting claims under these circumstances, *Stark* laws also prohibit payments by federal health care programs of such claims: "No payment may be made under this subchapter for a designated health service which is provided in violation of subsection (a)(1) of this section." 42 U.S.C. §1395nn (g)(1). If an entity submits prohibited claims and collects payment, the regulations implementing 42 U.S.C. § 1395nn require that any entity collecting payment for a healthcare service "performed under a prohibited referral must refund all collected amounts on a timely basis." 42 C.F.R. § 411.353.

40.    The *Stark* Statute's exceptions then identify specific transactions that will not trigger its referral and billing prohibitions. To avoid the referral and billing prohibitions in the *Stark* Statute, an entity's financial relationship with a physician must satisfy one of the exceptions.

41.    Once the plaintiff or the government has established proof of each element of a violation under the *Stark* laws, the burden shifts to the defendant to establish that the conduct was protected by an exception. If no

17

exception applies to a *Stark* violation, then all referrals from the referring physician to the DHS entity are subject to prohibition.

42. The *Stark* laws define ownership and investment interests to include every conceivable type of monetary ownership and investment relationship between a physician and a business entity. Such interests can be direct and indirect and can include stock ownership, debt, or other financial relationships. All ownership and investment interests by physicians are prohibited, unless one of the statute's specifically defined exceptions applies: (1) those relative to ownership or investment interests available to the public in publicly traded securities and mutual funds, regardless of the type of entity, 42 U.S.C. §1395nn(c)(1)(B); 42 C.F.R. § 411.356(a)(2)(ii), and (2) those relative to specific categories of entities---hospitals in Puerto Rico, rural entities, and certain hospitals---whether are not publicly traded. *See* 42 U.S.C. §1395nn(d); 42 C.F.R. § 411.356(c).

43. With respect to rural hospitals and hospitals in which the referring investor physician "is authorized to perform services" at the hospital, the Patient Protection and Affordable Care Act required that all such hospitals meet certain requirements within 18 months of March of 2010, including the following: a limitation on expansion of the facility's capacity; submission of an annual report to the Secretary that details efforts to prevent conflicts of

18

interest, including specifying "the identity of each physician owner or investor"; that the hospital "has procedures in place" that require a "referring physician owner or investor" to disclose the relevant ownership interests to an affected patient "by a time that permits the patient to make a meaningful decision regarding the receipt of care"; and the disclosure of the ownership interests on "any public website for the hospital" and in "any public advertising for the hospital." *See* Section 6001 (i)(1)(C) of the Affordable Care Act; 42 U.S.C. §1395nn(i)(1)(B); 42 U.S.C. §1395nn(i)(1)(C); 42 C.F.R. § 411.362(b)(2) and (3).

44. The Defendants have deliberately ignored these requirements of federal *Stark* laws. The Defendants have failed to establish and implement procedures to disclose the physician investment interests to affected patients.

45. As Chief Financial Officer of the KRH Physician Network since 2014, Mohatt's department has performed extensive accounting services related to the operations of HealthCenter, however, he has encountered a scheme of secrecy surrounding the identities of the physician investors in HealthCenter.

46. When Mohatt asked Laurie Gallub, the KRH Physician Network Finance Manager who formerly worked in KRH corporate finance, who would have access to the list of the investors in Flathead Physicians Group,

19

LLC, she said that it was kept strictly confidential and that only a few individuals were given access to the investors' identities.

47. The secret inner circle with access to the investor physicians' identities has included Tony Patterson (former KRHS General Counsel), Teryn Waldenberg (the former Executive Assistant to Tony Patterson---former KRHS General Counsel), Charlie Pearce (the KRHS Chief Financial and Information Officer), Marlene Horsfall (Charlie Pearce's Executive Assistant), Velinda Stephens (the late former KRHS Chief Executive Officer), Anita Kauffman (KRHS Finance Director), and Tate Kreitinger (HealthCenter's Chief Executive Officer).

48. The executive officers of Flathead Physicians Group have included Charles Pearce, the KRHS Chief Financial Officer, and Velinda Stevens, the late former Chief Executive Officer of KRHS.

49. Relator Jon Mohatt investigated further and uncovered why Defendants have guarded the identities of the investor physicians. Rather than full disclosure as required by federal law, the Defendants have guarded the investor physicians' identities to avoid public controversy about their conflicts of interest in referring patients to a hospital in which they are investors and to continue a lucrative business arrangement without exposing their violations of federal *Stark* laws.

50. The investor physicians have included many physicians who referred Medicare and Medicaid patients to HealthCenter and who shared in the revenues generated by their referrals to the HealthCenter each year. For example, the investor physicians have included orthopedic surgeons (Dr. Kim Stimpson and Dr. Donald Ericksen), general surgeons and thoracic surgeons (Dr. James Bonnet and Dr. Roch Boyer), cardiologists and pulmonologists (Dr. Brent Pistorese), radiologists (Dr. Donald Schumacher and Dr. William Benedetto), and gynecologists (Dr. Gwenda Jonas, Dr. Charles Ludden, and Dr. Kathleen Nelson). There are over 50 investor physicians in HealthCenter and most if not all of these physicians referred Medicare and Medicaid patients to HealthCenter and profited from these referrals with profit distributions from HealthCenter each year.

51. Due to their failure to comply with federal *Stark* laws governing the formation and operation of a hospital with physician investors, the Defendants have caused the submission of thousands of false claims to federal and state health care programs arising from referrals by such physicians.

## HealthCenter Has Overpaid Employed Gynecological Surgeons Based on Referrals

52. Separate and independent of the illegal investor arrangement at HealthCenter, HealthCenter has also employed and excessively paid five

21

gynecological surgeons in violation of *Stark* laws.

53. Since approximately July of 2015 when HealthCenter purchased Northwest Women's Health Center Clinic, HealthCenter has employed its own gynecological surgeons. All five of these physicians have been paid under employment agreements that did not require any minimum level of productivity or work relative value units (wRVUs), the most common measure of physician productivity. These units reflect the level of time, skill, training, and intensity required of a physician to provide a given service.

54. Four of these surgeons were only required to work every other week. For each week they worked, they received a week vacation.

55. All five of these physicians have produced wRVUs near or below the national 10th percentile. Yet HealthCenter has paid four surgeons cash compensation in excess of the national 90th percentile and one surgeon cash compensation in excess of the national 75th percentile.

56. Dr. Taylor has been paid $500,00.00 annually, Dr. Miller $450,000.00, Dr. Rogers $450,000, and Dr. Barrong $450,000. These salaries were far in excess of the national 90th percentile for gynecologists (MGMA $372,543.00) and yet these physicians produced below or just over the national 10th percentile. All of these physicians have worked part-time schedules yet compensated in excess of the national 90th percentile for full-

22

time gynecologists.

57.    For example in September of 2017, Mohatt evaluated the compensation and productivity of these physicians compared to data from the leading physician compensation survey published by MGMA.[2] Mohatt evaluated a full year of compensation and productivity for each of these physicians over the time period September 2016-August 2017.

58.    With respect to Dr. Taylor, his annual wRVUs were 3,012---just above the MGMA national 10th percentile of 2,556 for gynecologists. Yet his compensation package of $500,000 was far above the MGMA national 90th percentile ($372,543.00).   Dr. Taylor's base salary of $450,000 was far above the national 90th percentile plus Dr. Taylor received $50,000.00 for supposed "director" services. Dr. Taylor's cash compensation per wRVU was $166.00---nearly double the MGMA national 90th percentile of $85.46.

59.    With respect to Dr. Barrong, his annual wRVUs were 2,462--- below the MGMA national 10th percentile of 2,556 for gynecologists. Yet his salary of $450,000.00 was far above the MGMA national 90th percentile ($372,543.00).  Dr. Barrong's cash compensation per wRVU was $182.78--- over double the MGMA national 90th percentile of $85.46.

---

[2] The physician compensation percentiles quoted in this Complaint are compiled and published by the Medical Group Management Association that conducts the leading national surveys of physician compensation and productivity recognized in the health care industry.

60.    With respect to Dr. Eastham, his annual wRVUs were 1,574---well below the MGMA national 10th percentile of 2,556 for gynecologists. Yet his compensation of $330,300.08 was above the MGMA national 75th percentile ($303,493.00).  Dr. Barrong's cash compensation per wRVU was $209.85---over double the MGMA national 90th percentile of $85.46.

61.    With respect to Dr. Miller, his annual wRVUs were 1,863--- below the MGMA national 10th percentile of 2,556 for gynecologists. Yet his salary of $450,000.00 was far above the MGMA national 90th percentile ($372,543.00).  Dr. Miller's cash compensation per wRVU was $241.55--- nearly triple the MGMA national 90th percentile of $85.46.

62.    With respect to Dr. Rogers, his annual wRVUs were 3,305--- slightly above the MGMA national 10th percentile of 2,556 for gynecologists and below the national 25th percentile of 3,427. Yet his salary of $450,000.00 was far above the MGMA national 90th percentile ($372,543.00). Dr. Roger's cash compensation per wRVU was $136.16---far above the MGMA national 90th percentile of $85.46.

63.    Four of the surgeons (Drs. Rogers, Taylor, Barrong and Miller) were actually only required to work every other week, making them .5 full-time equivalent ("FTE") employees and increasing their annualized total cash compensation to double the numbers listed above.

24

64. The financial losses from compensation of these gynecological surgeons have been in excess of $1.3 million per year, but in September of 2017, HealthCenter CEO, Tate Kreitinger, told these surgeons that the losses were acceptable because the revenues from their referrals more than offset the losses. Kreitinger provided a written report to the lead surgeon (Dr. Taylor) listing the gross facility fees that HealthCenter received from each of the surgeons' referrals. This report showed the volume and value of each physician's referrals or technical fees generated to HealthCenter from August 2016-July 2017. Dr. Barrong generated 107 procedures with technical fees to HealthCenter in the amount of $1.50 million, Dr. Miller generated 82 procedures with technical fees to HealthCenter in the amount of $1.49 million, Dr. Rogers generated 74 procedures with technical fees to HealthCenter in the amount of $1.36 million, Dr. Eastham generated 41 procedures with technical fees to HealthCenter in the amount of $656,809, and Dr. Taylor generated 124 procedures with technical fees to HealthCenter in the amount of $2.16 million. From August 2016-July 2017, these five surgeons generated gross technical fees of $7.17 million to HealthCenter.

65.    The *Stark* laws generally prohibit physicians from referring[3] their Medicare and Medicaid patients to business entities, such as hospitals or laboratories, with which the physicians or their immediate family members have a "financial relationship." 42 U.S.C. §1395nn(a)(1); *see* generally 42 C.F.R. §§ 411.350-.389 ("Subpart J---Financial Relationships Between Physicians and Entities Furnishing Designated Services"). Subsequent amendments later extended certain aspects of *Stark* laws to Medicaid patients. *See* 42 U.S.C. §1396b(s).

66.    The statute and regulations further prohibit any entity from submitting a Medicare claim for services rendered pursuant to a prohibited referral, 42 U.S.C. §1395nn(a)(1)(B); 42 C.F.R. §411.353(b), prohibit Medicare from paying any such claims, 42 U.S.C. §1395nn(g)(1); 42 C.F.R. §411.353(c), and require an entity that receives payment for such a claim to reimburse the funds to the United States, 42 C.F.R. §411.353(d).

---

[3] The *Stark* Statute defines "referral" as "the request or establishment of a plan of care by a physician which includes the provision of designated health services." 42 U.S.C. § 1395nn (h) (5) (A). The accompanying regulations also broadly define "referral" as, among other things, "a request by a physician that includes the provision of any designated health service for which payment may be made under Medicare, the establishment of a plan of care by a physician that includes the provision of such a designated health service, or the certifying or recertifying of the need for such a designated health service . . . ." 42 C.F.R § 411.351. A referring physician is defined in the same regulation as "a physician who makes a referral as defined in this section or who directs another person or entity to make a referral or who controls referrals made to another person or entity." *Id.*

67. The *Stark* laws define a "financial relationship" to include a "compensation arrangement," 42 U.S.C. §1395nn(a)(2), which means "any arrangement involving any remuneration between a physician (or an immediate family member of such physician) and an entity." *See* 42 U.S.C. §1396nn(H)(1)(A).

68. In turn, "remuneration" is broadly defined to include "any remuneration, directly or indirectly, overtly or covertly, in cash or in kind." 42 U.S.C. §1395nn(h)(1)(B); *see also* 42 C.F.R. §411.351 ("Remuneration means any payment or other benefit made directly or indirectly, overtly or covertly, in cash or in kind").

69. Any remuneration or benefit given by a hospital to a physician must be based solely on the physician's personal labor. In pertinent part, the statutory language focuses on "the fair market value of the services" personally performed by the physician. *See* 42 U.S.C.S. § 1395nn (e)(2). The *Stark* law prohibits a hospital from offering or giving remuneration or benefits to referring physicians "in a manner that takes into account (directly or indirectly) the volume or value of any referrals by the referring physician." 42 U.S.C.S. §1395nn(e)(2).

70. The *Stark* law also requires that physician remuneration must be "provided pursuant to an agreement which would be commercially

27

reasonable even if no referrals were made" to the hospital. 42 U.S.C.S. § 1395nn (e)(2).

71. A hospital employing a physician who makes referrals to that hospital of Medicare and Medicaid patients must satisfy the statutory requirements for "bona fide employment relationships." Under the *Stark* laws, a "bona fide employment relationship" must satisfy the following four relevant requirements: (1) the "employment is for identifiable services," (2) "the amount of the remuneration under the employment...is consistent with the fair market value of the services" personally provided by the physician, (3) the remuneration "is not determined in a manner that takes into account (directly or indirectly) the volume or value of any referrals by the referring physician," and (4) "the remuneration is provided pursuant to an agreement which would be commercially reasonable even if no referrals were made to the employer." 42 U.S.C.S. § 1395nn (e)(2).

72. HealthCenter violated these well-established requirements of *Stark* laws in multiple ways. The compensation provided to these five gynecological surgeons was determined in a manner that took into account the volume and value of their referrals to HealthCenter. The compensation was not simply based on the value of their personal services. The compensation was not commercially reasonable if they made no referrals to

28

HealthCenter. With no productivity requirements, minimal productivity, and part-time work schedules for four of these five physicians, HealthCenter paid these gynecologists in excess of the national 90th percentile.

## Defendants' Liability for Penalties Under the *Stark* Laws

73.    The *Stark* law is not a criminal statute and contains no scienter elements. If an entity has a "financial relationship" with a physician, then the entity "may not present or cause to be presented" any claims to Medicare or Medicaid for "designated health services" arising from referrals by such physician. 42 U.S.C. §1395nn(a)(1)(B).

74.    Violations of *Stark* laws carry multiple penalties. First, payment for a prohibited referred designated health service is barred. Any amounts billed and collected from Medicare or Medicaid are subject to refund. 42 U.S.C. §1395nn(g)(2). HealthCenter's billings to federal and state health care programs have been substantial with $32.7 million in Medicare charges in fiscal year 2014 and $4.7 million in Medicaid charges. The numbers increased in fiscal year 2015 with approximately $40 million in Medicare charges and $6 million in Medicaid charges. A substantial portion of such charges arose from referrals by investor physicians to HealthCenter.

75.    Second, the entity is subject to a civil monetary penalty of $15,000 for each prohibited referral that is billed to Medicare or Medicaid. *See* 42 U.S.C.

§1395nn(g)(3). The entity is also subject to "an assessment of not more than three times the amount claimed for each such service in lieu of damages sustained...because of such claim." 42 U.S.C. §1320a-7a(a).

76. Third, each entity that bills Medicare or Medicaid must identify to the HHS Secretary its ownership, investment, and compensation arrangements. Failure to report that information subjects the entity to a civil monetary penalty of up to $10,000.00 per day, as well as permissive exclusion from participation in federal health care programs.

## Introduction to the Anti-Kickback Statute

77. Similar to *Stark* laws, the federal Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b), arose out of Congressional concern that financial inducements to those who can influence health care decisions would result in goods and services being provided that are medically unnecessary, too costly, of poor quality or even harmful to a vulnerable patient population.

78. The Anti-Kickback Statute was based in part on studies demonstrating that physicians, even those intending to act in good faith, were likely to refer significantly more patients when there was a financial incentive to generate business. The AKS arose out of congressional concern that financial inducements given to those who can influence healthcare decisions corrupt medical decision-making.

30

79.     To protect the integrity of federal health care programs and realizing the difficulty of regulators and law enforcement to review every case for medically unnecessary procedures, Congress enacted a *per se* prohibition against financial inducements in any form, regardless of whether the particular inducement gave rise to overutilization or poor quality of care.

80.     First enacted in 1972, Congress strengthened the statute in 1977 and in 1987 to ensure that financial inducements masquerading as legitimate transactions did not evade its reach. *See* Social Security Amendments of 1972, Pub. L. No. 92-603, §§ 242(b) and (c); 42 U.S.C. § 1320a-7b, Medicare-Medicaid Anti-fraud and Abuse Amendments, Pub. L. No. 95-142; Medicare and Medicaid Patient and Program Protection Act of 1987, Pub. L. No. 100-93.

81.     The AKS prohibits a healthcare provider from offering or paying "any remuneration...directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person to...refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program." 42 U.S.C. § 1320a-7b(b).

82.     The OIG Anti-Kickback Provisions, 56 Fed. Reg. 35952, 35958 (1991) broadly define the term "remuneration" as "anything of value in any

31

form whatsoever."

83.   Compliance with the AKS is a precondition of participation as a healthcare provider in federal-funded healthcare programs.

84.   Compliance with the AKS is a mandatory material condition of each payment for each claim by the Medicare Program and the Medicaid Program. *See* 42 U.S.C. § 1320a-7b (b).

85.   Claims for payment for services tainted by financial inducements for referrals prohibited by the AKS are false or fraudulent under the False Claims Act because providers of such services are ineligible to participate in government healthcare programs, and the government would not have paid such claims had it known of the financial inducements for referrals. *See* 31 U.S.C. §§ 3729(a) & (b); 42 U.S.C. §§ 1320a-7b(b), (f) & (g).

86.   In the Patient Protection and Affordable Care Act of 2010, Pub. L. No. 111-148, § 6402 (f), 124 Stat. 119, 759 (2010), codified at 42 U.S.C. §1320a-7b(g), Congress amended the AKS to state explicitly that a "claims that includes items or services resulting from a violation of this section constitutes a false or fraudulent claim for purposes of [the False Claims Act]." According to the legislative history, this amendment to the AKS was intended to clarify "that all claims resulting from illegal kickbacks are considered false claims for purposes of civil action under the False Claims

Act…" 155 Cong. Rec. S10854 (daily ed. Dec. 21, 2010).

87.    "With respect to violations of [the Anti-Kickback Statute], a person need not have actual knowledge of this section or specific intent to commit a violation of this section." 42 U.S.C. § 1320a-7b(h).

## Defendants Participated in Conspiracy to Reward Physicians for Referrals in Violation of *Stark* Laws and the AKS

88.    Rather than complying with federal *Stark* laws and the AKS, the Defendants participated in a longstanding scheme and conspiracy to reward physicians for referrals.

89.    HealthCenter's Chief Executive Officer has been Tate Kreitinger. He has served in this position since approximately 2006. Kreitinger is also the Chief Compliance Officer for KRHS. In that position, he has reported directly to the KRHS Chief Executive Officer and he has been a member of the KRHS senior executive team.

90.    For many years under Kreitinger's leadership, HealthCenter's accountants have tracked the value and volume of referrals from investor physicians, the value and volume of referrals from all physicians employed by HealthCenter, and the value and volume of referrals to HealthCenter from all physicians employed by KRHS, KRMC or affiliated entities. These accounting reports tracking the values and volumes of referrals from all physicians were the regular business practice at HealthCenter.

33

91.    Most of the referral tracking reports were compiled by Chris Hassler. With her emails attaching the referral tracking reports for other executives of HealthCenter and KRHS, Hassler's email signature stated, "Chris Hassler, NWHC Parent Corporation Finance Department." NWHC is the acronym for Northwest HealthCenter.   Hassler has also served as an employed corporate cost accountant for KRHS.

92.    HealthCenter through its Chief Executive Officer agreed to participate in the scheme because it was lucrative. HealthCenter regularly tracked revenues from referrals by all physicians employed by KRHS entities or KRMC and provided tracking reports to KRHS executives who used these referral revenues to determine physician compensation and reward physicians for referrals while KRHS's wholly owned subsidiary, Northwest Horizons, received 60.1 percent of HealthCenter's profits each year and HealthCenter's physician investors received 39.9 percent.

93.    KRHS and KRMC's executives allocated a portion of HealthCenter's ancillary revenues from referrals by these physicians to subsidize the scheme to over-pay employed physicians far above the value of their personal productivity. This accounting maneuver that rewarded physicians for their referrals to HealthCenter has been ongoing for years. HealthCenter's profits in part have subsidized the losses from the over-compensation of Northwest

34

Montana Surgical Associates, Northwest Orthopedics and Sports Medicine, Kalispell Gastroenterology, and Bass Breast Center.

94.    There were multiple financial inducements for Defendants to enter into this understanding and agreement. The scheme was lucrative for HealthCenter because physicians were incentivized to generate referrals to HealthCenter in multiple ways. Investor physicians profited from all referrals to HealthCenter and many of the investor physicians were also compensated as employees within a health care system that monitored, tracked, and rewarded referrals in their excessive compensation packages, including referrals to HealthCenter.

95.    Additionally, KRMC has provided extensive administrative services to HealthCenter at below fair market value, therefore reducing HealthCenter's expenses and increasing profits distributed to physician investors. First, the KRMC Revenue Cycle Department has handled collections for HealthCenter at a cost of only 4.5% of collections when the commercial market charges a minimum of 8% and normally more. KRMC's costs to provide the collection services have been significantly higher than 4.5%. Mohatt has advocated for increasing the collection rate to fair market value; however, the KRHS Chief Financial Officer, Charles Pearce, and the HealthCenter Chief Executive Officer, Tate Kreitinger, rejected this idea. In

35

2016, KRMC began to charge Northwest Imaging, the contracted radiologist group, 8-8.25% for revenue cycle services, but Pearce and Kreitinger refused to charge HealthCenter the same rate even though that was the percentage it would take to reimburse KRMC for the cost of the services.

96. Secondly, KRMC and KRH Physician Network executives and staff have provided free operational and financial services to all HealthCenter clinics. These HealthCenter clinics include Glacier View Plastic Surgery, GI Endoscopy Clinic, Northwest Women's Health Care, and Montana Center for Pain & Wellness.

97. The free financial services provided by KRMC and KRH Physician Network managers and staff include:

- Calculations and payment of all provider productivity bonuses
- Monthly reports required for month end close of general ledger
- General ledger journal entries
- Review and correct monthly financial statements
- Provide ad hoc reports and analysis for any business decisions requiring analysis
- Produce monthly provider productivity reports (Provider Dashboards)
- Answer and assist managers with any financial or accounting questions
- Collect and review monthly budget variance reports
- Develop annual budget
- Provide all finance and accounting functions

98.   Additionally the KRH Chief Operations Officer (Gary Chalfant) and his team have provided all operational support to HealthCenter clinics, including leadership oversight, manager interviews and hiring, supervision and annual reports for all managers, development of provider contracts, development of provider compensation models, clinical quality oversight of nursing and other clinical staff through the KRH Director of Nursing, and any other operational issues dealing with the ambulatory setting or providers.

99.   HealthCenter pays nothing for these extensive services, thereby increasing its profits and distributions to the physician investors. Mohatt has advocated for HealthCenter paying fair market value for these services; however, the KRHS Chief Financial Officer, Charles Pearce, and the HealthCenter Chief Executive Officer, Tate Kreitinger, rejected this fundamental requirement.

100.   The free services were part of the conspiracy and scheme to maximize the profits of the HealthCenter and maximize distributions to physician investors as rewards for patient referrals.

101.   There is extensive written evidence of Defendants' executives, accountants, and physicians conspiring together in a scheme to reward physicians for patient referrals.

37

102. In the first year of his employment as Chief Financial Officer of the KRH Physician Network, Mohatt encountered a culture in which surgeons knew they were being compensated based in part on the value of their referrals to HealthCenter.

103. For example, in May of 2015, Dr. Origitano asked Mohatt to give him referral revenues on neurosurgery's "top 20" procedures. On May 12, 2015, Jon sent an email to Hassler and asked her, "On a separate note, have you done a report for Dr. Origitano on Neurosurgery's top 20 surgeries and their profit margin? I know he discussed this with me again the other day and mentioned that he would love to see what the hospital's margin is on the surgeries they do most."

104. In this email exchange between Mohatt and Hassler on May 12, 2015, Mohatt. wrote, "I am always asked for these numbers when presenting clinic results to the specialty providers. I am meeting with NOSM [orthopedic group] tomorrow night and I know they are going to want to know how much they brought in for the hospital when I show them their clinic losses ~($3M)." Mohatt was focused on reducing physician losses as the Chief Financial Officer of the Physician Network, yet he encountered a corporate culture that budgeted for such losses while tracking the offsetting values and volumes of referrals by the physicians to HealthCenter.

38

105. On May 19, 2015, Hassler provided Mohatt with a report that listed the HealthCenter's profits from referrals by the orthopedic surgeons for the 12 months ending March 31, 2015. HealthCenter's profits from referrals by the orthopedic surgeons in that single year totaled $1.75 million. According to the referral tracking reports, the orthopedic surgeons generated 640 patient referrals for outpatient services at HealthCenter with net revenues of $456,055 to HealthCenter and profits of $274,720, 53 inpatient referrals with net revenues of $716,922 to HealthCenter and profits of $129,966, 52 patient referrals for observation services to HealthCenter with net revenues of $383,227 to HealthCenter and profits of $71,377, 833 patient referrals for same day surgeries at HealthCenter with net revenues of $2.98 million to HealthCenter and profits of $1.27 million. The orthopedic surgeons generated 1,578 total patient referrals to HealthCenter in that fiscal year with net revenues of 4.53 million to HealthCenter and profits of $1.75 million. The referral tracking data included all revenues generated by the orthopedic surgeons to HealthCenter from inpatient, observation, same day surgery cases and "outpatient ancillary services like imaging and lab tests."

106. On May 22, 2015, Mohatt asked Hassler if there were similar referral tracking reports from other "service lines." Mohatt further stated, "Our physician leads are then asking to see the data refreshed once a quarter

39

moving forward." The surgeons followed their referral revenue data and knew that their compensation was based in part on the value of their referrals to HealthCenter. Hassler confirmed that there were similar referral tracking reports for all physician specialties to HealthCenter.

107. Mohatt also uncovered evidence that the conspiracy had been going on for years at HealthCenter and KRH.

108. On February 21, 2011, Jack Bell, Executive Director of the Medical Practices Division, sent an email to Chris Hassler and copied Perry Howell, the former Chief Financial Officer of the KRH Physician Network. Bell wrote, "I am in need of some data to prepare a Board presentation on Northwest Montana Surgical." Bell requested "surgical cases, gross revenue, net revenue, and contribution margins" for 10 surgeons over the time period of 2007-2011. The information Bell sought was the volume and value of referrals from these 10 surgeons to KRMC and HealthCenter. On March 4, 2011, Hassler responded and provided Bell with a spreadsheet summarizing the referral tracking data for each surgeon. Hassler explained that the "data represents the entire patient visit, not just the surgical portion of the cases."

109. The referral tracking data included the values and volumes of referrals to HealthCenter for every surgeon in Northwest Montana Surgical for each year between 2007 and 2011. For each surgeon, the reports listed the

40

volumes of surgery cases referred to HealthCenter, the gross revenues from such referrals, net revenues from such referrals, variable costs for such referrals, the contribution margin or profits from such referrals, the fixed costs, and margin after considering fixed costs. The reports also listed collective revenue data for the entire group of Northwest Montana Surgical with respect to their patient referrals to HealthCenter.

110. In April of 2011, Hassler sent an email to Howell that enclosed reports listing the volumes and values of surgery referrals from Dr. Melissa Hulvat and the Breast Center Group to HealthCenter in FY 2010 and FY 2011 as of January.

111. For FY 2010, the reports tracked 110 surgery referrals from Dr. Hulvat to HealthCenter with net revenues of $494,000 and a "contribution margin" or profit of $257,000 to HealthCenter. In FY 2011 as of January, her referrals of surgery cases to HealthCenter increased to 131 cases with net revenues of $764,000 and a contribution margin or profit of $381,000 to HealthCenter.

112. For FY 2010, the reports also tracked 332 surgery referrals from the Breast Center Group to HealthCenter with net revenues of $641,000 and a "contribution margin" or profit of $349,000 to HealthCenter. In FY 2011 as of January, their referrals of surgery cases to HealthCenter increased to 511

41

cases with net revenues of $1.03 million and a contribution margin or profit of $538,000 to HealthCenter.

113. Hassler sent this information to Howell because Kelly Gallipeau, the Practice Manager for Northwest Montana Surgical Associates and Bass Breast Center, had a meeting with Dr. Hulvat "this afternoon." The surgeons performing procedures at HealthCenter regularly received data regarding the volume and value of their referrals because the HealthCenter's monitoring and tracking system was intended to induce and reward continued referrals.

114. In October and November of 2011, Hassler sent reports to Perry Howell tracking revenues from referrals by Dr. Sheldon to HealthCenter for FY 2011 and FY 2012 as of September. These reports tracked the volume of referrals by Dr. Sheldon to HealthCenter, the gross charges from his referrals, the net revenues to the HealthCenter from his referrals, the variable expenses, and the contribution margin or profits to HealthCenter from his referrals for both FY 2011 and FY 2012.

115. On November 8, 2011, Chris Hassler and Kelly Gallipeau, the Practice Manager for Northwest Montana Surgical Associates and Bass Breast Center, exchanged emails regarding the volume and value of referrals from Dr. Rourke, Dr. Hulvat, and the Breast Center to HealthCenter in 2009, 2010, and 2011.

116. On November 9, 2011, Hassler sent Howell, Pearce and Anita Kauffman reports that tracked the volume of surgery cases referred by the orthopedic surgeons to HealthCenter and KRMC for the fiscal years 2006-2012. This report reflected KRH's and HealthCenter's referral tracking system dating back years before 2011. Hassler's email signature again stated, "Chris Hassler, NWHC Parent Corporation Finance Department."

117. On January 26 and January 27, 2012, Hassler and Gallipeau exchanged emails regarding the volume and value of referrals from Dr. Hulvat and the Bass Center Group to HealthCenter in FY 2010, FY 2011, and FY 2012 as of December. The reports provided by Hassler included revenues from "all ancillary services" related to Dr. Hulvat's and Bass Center's referrals to HealthCenter.

118. The Bass Center's volume of referrals to HealthCenter increased from 471 patient referrals in FY 2010 to 802 patient referrals in FY 2011 and 861 patient referrals annualized for FY 2012. The Bass Center's value of referrals to HealthCenter also significantly increased, moving from $791,000 net revenues to HealthCenter in FY 2010 to $1.3 million in net revenues in FY 2011 and $1.13 in net revenues to HealthCenter annualized for FY 2012. Hassler's email signature on her report again stated, "Chris Hassler, NWHC Parent Corporation Finance Department."

43

119. Gallipeau requested this updated referral revenue data from Hassler because Dr. Hulvat was giving a "presentation" to the Board of Trustees on February 7, 2012. The system of tracking physician referrals at HealthCenter and KRH was known and communicated at the highest levels of management, including the Board of Trustees.

120.   On February 7, 2012, Hassler sent Howell a report requested by Velinda Stephens, the former CEO of KRH, regarding the volume and value of referrals from all surgery groups to HealthCenter and KRMC for FY 2011 and 2012. The report listed the numbers of patient referrals and net revenues to HealthCenter from patient referrals by ENT, Northwest Surgical Associates, Dr. Hulvat and Bass Center, NOSM (the orthopedic group), Oncology Surgery, and Urology.  The report also analyzed the division of referrals between HealthCenter and KRMC. Overall for all surgery groups, 52 percent of the surgeons' referrals were to HealthCenter and 48 percent were to KRMC.  With respect to revenues generated by the surgeons' referrals, HealthCenter represented 27 percent of overall revenues in FY 2011 and 29 percent in FY 2012.  The surgeons' referrals to HealthCenter generated $7.8 million in net revenues in FY 2011 and $7.1 million in FY 2012 year-to-date.

121. For FY 2011, the report tracked 532 patient referrals from ENT to HealthCenter with net revenues of $1.2 million to HealthCenter, 430 patient referrals from Northwest Surgical Associates with net revenues of $1.18 to HealthCenter, 161 patient referrals from Dr. Hulvat with net revenues of $882,391 to HealthCenter, 872 patient referrals from NOSM to HealthCenter with net revenues of $3.2 million to HealthCenter, and 307 patient referrals from Urology to HealthCenter with net revenues of $1.24 million to HealthCenter.

122. On March 12, 2012, Hassler sent "neuro center historical data" to Jack Bell and Perry Howell that included the volumes and values of referrals from neurosurgeons and neurologists to the HealthCenter Pain Center for Fiscal Years 2009, 2010, 2011, and 2012 as of December. For example, in FY 2011, the "neuro center" physicians referred 1,398 patients to the HealthCenter Pain Center for surgeries and 18,491 patients to the HealthCenter Pain Center Clinic. These referrals generated $4.1 million in net revenues to HealthCenter for FY 2011. The "neuro center" physicians also referred 198 patients for rehabilitation at HealthCenter in FY 2011, generating net revenues of $3.2 million to HealthCenter.

123. On April 25, 2013, Hassler sent Howell another report regarding the volume and value of referrals from all surgery groups to HealthCenter for

the past five years. The report listed the numbers of patient referrals and net revenues to HealthCenter from patient referrals by ENT, Northwest Surgical Associates, Dr. Hulvat and Bass Center, NOSM (the orthopedic group), Oncology Surgery, and Urology.

124.   On June 18, 2013, DeAnna Eisenman sent an email to Charles Pearce, Perry Howell, Craig Eddy, Kathy Dick, and Marlene Horsfall and stated, "Velinda [the former KRH Chief Executive Officer] wants to have a meeting to review the 4 practices in July NW Ortho, MT Center, Both RMHLs, and Neurosurgery." The meeting was scheduled for July 10, 2013 from 9:00-12:00 noon. In the weeks leading up to the meeting, Hassler circulated numerous reports listing the hospital system's profits and HealthCenter's profits from referrals by each of the physician groups listed as a focus of the meeting requested by the former CEO.

125.   On August 12, 2013, Hassler sent a report to Howell listing the volumes and values of referrals by the orthopedic group or NOSM to HealthCenter in FY 2011, FY 2012, and FY 2013. Howell had a meeting with the NOSM surgeons and wanted the referral revenue data to use in his meeting with the surgeons. The orthopedic surgeons' referrals generated net revenues of $3.58 million to HealthCenter in FY 2011, $4.30 million in FY 2012, and 5.44 million in FY 2013.

126. On November 13, 2013, Howell requested that Hassler update the referral tracking reports for the orthopedic surgeons to include August and September. Howell stated, "I need it for a meeting tonight." Hassler provided Howell with a report that tracked the value of the orthopedic surgeons' referrals to HealthCenter in FY 2011, FY 2012, FY 2013, and April through July of FY 2014. For example, the orthopedic surgeons' referrals to HealthCenter generated net revenues of $566,8906 in April, $486,946 in May, $408,406 in June, and $528,017 in July.

127. In 2015, the HealthCenter accountant, Chris Hassler, again regularly prepared reports for Stevens that listed the volume and profits from referrals by neurologists and neurosurgeons, including referrals to HealthCenter. In 2015, Hassler also regularly prepared reports for Stevens that listed the volume and profits from referrals by employed orthopedic surgeons to HealthCenter and reports that listed the volume and profits from referrals by general surgeons to HealthCenter.

128. Each year all surgeons' volumes of referrals to HealthCenter were monitored, tracked, and ranked on a "Top 30" list circulated from HealthCenter's executive office back to KRHS's former Chief Executive Officer. The "Top 30" list ranked the surgeons by the numbers of inpatient referrals and the numbers of outpatient referrals to HealthCenter and KRMC.

47

This data was a continuing focus of Defendants' conspiracy to reward physicians for referrals.

## Compliance with *Stark* Laws and AKS Was Mandatory Condition of Federal and State Payments

### Compliance with *Stark* Laws and AKS Was Mandatory Condition of Federal Medicare Payments

129. Compliance with *Stark* laws and the AKS is a mandatory condition of enrollment in Medicare and Medicaid, a mandatory condition of submitting any claim for payment to Medicare or Medicaid, and a mandatory condition of Medicare or Medicaid paying any claim.

130. Federal health care programs include patients covered under the Medicare, Medicaid, and TRICARE Programs discussed below in addition to federal employees and retired federal employees.

131. Since 2012, HealthCenter has received substantial revenues from Medicare arising from treatment of patients referred by investor physicians.

132. In 1965, Congress enacted Title XVIII of the Social Security Act (Medicare) to pay for the cost of certain medical services for persons aged 65 years or older and those with disabilities.

133. Medicare is divided into four parts. Medicare Part A authorizes payment for institutional care, including hospital, skilled, nursing facility,

and home health care. *See* 42 U.S.C. §§ 1395c-1395i-4. Part B of Medicare authorizes payment for outpatient health care expenses, including physician fees. *See* 42 U.S.C. §§ 1395-1395w-4.

134. HHS is responsible for the administration and supervision of Medicare. The Centers for Medicare and Medicaid Services ("CMS") is an agency of HHS and is directly responsible for the administration of Medicare.

135. Under the Medicare Program, CMS makes payments retrospectively to providers for patient services. Medicare enters into provider agreements with medical providers to establish their eligibility to participate in Medicare.

136. Compliance with *Stark* laws and the AKS is a mandatory material condition of payment by Medicare.

137. Medicare requires every provider who seeks payment from the Program to promise and ensure compliance with *Stark* laws, the AKS, and with other federal laws governing the provision of healthcare services in the United States.

138. The enrollment application that providers must execute to participate in Medicare contains the following certification: "I agree to abide by the Medicare laws, regulations and program instructions that apply to this

49

provider. The Medicare laws, regulations, and program instructions are available through the Medicare contractor. **I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations and program instructions (including but not limited to, the Federal anti-kickback statute and the Stark law),** and on the provider's compliance with all applicable conditions of participation in Medicare." (Emphasis added).

139. When a medical provider enrolls in the Electronic Data Interchange to submit electronic claims for payment to Medicare, the provider must agree that "it will submit claims that are accurate, complete, and truthful" and must "acknowledge that all claims will be paid from Federal funds…and that anyone who misrepresents or falsifies or causes to be misrepresented or falsified any record or other information relating to that claim is required pursuant to Agreement may, upon conviction, be subject to a fine and/or imprisonment under applicable Federal law."

140. Since at least 2012 Defendants have submitted or caused the submission of thousands of false claims to Medicare. First, all the claims for "designated health services" arising from referrals by investor physicians to HealthCenter violated *Stark* laws and constitute false claims caused by Defendants. Secondly, all claims submitted to Medicare arising from

50

referrals by the overcompensated employed physicians of HealthCenter constitute false claims. Third, the Defendants participated in a scheme to induce and reward physicians for referrals in violation of *Stark* laws and the AKS, causing the submission of thousands of false claims to federal and state health care programs.

## Compliance with *Stark* Laws and AKS Was Mandatory Condition of Federal-State Medicaid Payments

141. The Medicaid Program is a joint federal-state program that provides health care benefits primarily for the poor and disabled. Medicaid is authorized under Title XIX of the Social Security Act and is administered by each State in compliance with federal requirements specified in the Medicaid statute and regulations. "The States operate Medicaid programs in accordance with Federal laws and regulations and with a State plan that we approve." 66 Federal Register 857.

142. The federal Medicaid statute sets forth minimum requirements for state Medicaid programs to qualify for federal funding, which is called federal financial participation (FFP). 42 U.S.C. §§1396, *et seq.* As part of such minimum requirements, each state's Medicaid program must cover hospital and physician services. *See* 42 U.S.C. § 1396a (10)(A), 42 U.S.C. § 1396d (a)(1)-(2), (5).

51

143. The federal matching rate for the Montana Medicaid Program is approximately 65 percent.

144. In Montana, provider hospitals participating in Medicaid file annual cost reports with the state's Medicaid agency, or its intermediary, in a protocol similar to that governing the submission of Medicare cost reports. Medicaid providers must incorporate the same type of financial data in their Medicaid cost reports as contained in their Medicare cost reports.

145. Within such Medicaid cost reports, hospitals must certify the accuracy of the information provided and certify compliance with Medicaid laws and regulations, including compliance with the *Stark* laws and the AKS.

146. The Montana Medicaid Program used the Medicaid patient data in the cost reports to determine the payments due each facility.

147. Defendants submitted or caused the submission of claims to Medicaid that were based in part on Medicaid cost reports with false certifications of compliance with the *Stark* laws and the AKS. The Montana Medicaid Program relied upon such certifications as mandatory conditions of payment before paying such claims.

### The Federal False Claims Act and Montana False Claims Act

148. The federal False Claims Act establishes liability, *inter alia,* for anyone who "knowingly presents, or causes to be presented, to an officer

52

or employee of the United States Government . . . a false or fraudulent claim for payment or approval," 31 U.S.C. § 3729(a)(1)(A), or "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim," 31 U.S.C. § 3729(a)(1)(B), or "knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation[4] to pay or transmit money or property to the Government." 31 U.S.C. § 3729(a)(1)(G). The Montana False Claims Act contains similar provisions in Montana Code Annotated §17-8-403(1).

149. "The term 'material' means having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b)(4); *see also* Mont. Code Ann. § 17-8-402(6). A violation of *Stark* law or the AKS is material to the government's decision to pay, and a violation of the *Stark* laws or the AKS renders resulting claims to federal and state health care programs false in violation of the federal False Claims Act and/or Montana False Claims Act.

150. "Claim" includes "any request or demand, whether under a contract

---

[4] The False Claims Act defines "obligation" as "an established duty, whether or not fixed, arising from an express or implied contractual, grantor-grantee, or licensor-licensee relationship, from a fee-based or similar relationship, from statute or regulation, or from the retention of any overpayment." 31 U.S.C. § 3729(b)(3).

or otherwise, for money or property and whether or not the United States has title to the money or property, that…is presented to an officer, employee or agent of the United States…or is made to a contractor, grantee or other recipient, if the money or property is to be spent on the Government's behalf or to advance a Government program, and if the United States Government…provides or has provided any portion of the money or property requested or demanded…or will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded." 31 U.S.C. § 3729(b)(2); *see also* Mont. Code Ann. § 17-8-402(2).

151.  Statutory liability under the federal False Claims Act and Montana False Claims Act includes a civil penalty "not less than $5,500 and not more than $11,000" per false claim "plus three times the amount of damages which the Government sustains because of the act of that person." 31 U.S.C. § 3729(a); *see also* Mont. Code Ann. § 17-8-403(1).

152.  Under the federal False Claims Act and Montana False Claims Act, "'knowing' and 'knowingly' mean that a person, with respect to information (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information." 31 U.S.C.

54

3729 (b)(1); *see also* Mont. Code Ann. § 17-8-402(5)(a).

153.   In considering the requisite *scienter* which subjects a defendant to liability under the federal False Claims Act and Montana False Claims Act, "no proof of specific intent to defraud" is required. 31 U.S.C. 3729 (b)(1); *see also* Mont. Code Ann. § 17-8-402(5)(b).

154.   Liability under the federal False Claims Act and Montana False Claims Act is "joint and several for any act committed by two or more persons." *See* Mont. Code Ann. § 17-8-403(4).

## Count I--- Causing False Claims for Payment

155.   Relator repeats the allegations and statements contained in all of the preceding paragraphs as though fully set forth herein.

156.   In pertinent part, the federal False Claims Act and Montana False Claims Act establish liability for "any person who…knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval." 31 U.S.C. § 3729(a)(1)(A); *see* Mont. Code Ann. § 17-8-403(1)(a).

157. Defendants knowingly or in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, presented or caused to be presented false claims "for payment or approval" to the United States and State of Montana in violation of 31 U.S.C. § 3729(a)(1)(A) and Montana Code Ann. § 17-8-403(1)(a).

158. This is a claim for treble damages and penalties under the federal False Claims Act, 31 U.S.C. § 3729, *et seq.*, and Montana False Claims Act, Mont. Code Ann. § 17-8-403(1).

159. Through the acts described above, Defendants knowingly or in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, presented or caused to be presented, false claims to officers, employees or agents of the United States Government and State of Montana, within the meaning of 31 U.S.C. § 3729(a)(1)(A) and Montana Code Ann. § 17-8-403(1)(a).   .

160. The United States and State of Montana were unaware of the falsity of the records, statements and claims made or caused to be made by Defendants. In reliance on the accuracy of the claims, information, records, and certifications submitted by Defendants, the United States and State of Montana paid claims that would not have been paid if they knew about Defendants' illegal conduct.

161. As a result of the Defendants' acts, the United States and State of Montana have sustained damages in a substantial amount to be determined at trial.

162. Additionally, the United States and State of Montana are entitled to a civil penalty of between $5,500 and $11,000 for each false claim made or caused to be made by Defendants arising from their illegal conduct described in this Complaint.

## Count II--- False Statements

163. Relator repeats the allegations and statements contained in all of the preceding paragraphs as though fully set forth herein.

164. In pertinent part, the federal False Claims Act and Montana False Claims Act establish liability for "any person who…knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." 31 U.S.C. § 3729(a)(1)(B); *see* Mont. Code Ann. § 17-8-403(1)(b).   .

165. This is a claim for treble damages and penalties under the federal False Claims Act, 31 U.S.C. § 3729, *et seq.*, and Montana False Claims Act, *see* Mont. Code Ann. § 17-8-403, *et seq.*

166. Through the acts described above, Defendants knowingly made, used, or caused to be made or used, false records and statements, i.e., the false

certifications made by Defendants in submitting claims each fiscal year to get false claims paid or approved by the United States and State of Montana. Through the acts described above, the Defendants knowingly made, used, or caused to be made or used, false records and statements, and omitted material facts, to get false claims paid or approved, within the meaning of 31 U.S.C. § 3729(a)(1)(B) and Montana Code Ann. § 17-8-403(1)(b). The records were false in that they purported to show compliance with federal *Stark* laws and the AKS.

167. The Defendants knowingly made, used, or caused to be made or used false records or statements with the intent to get or cause these false claims to be paid by the United States and State of Montana. The statements were made knowingly because they knew that their scheme violated *Stark* laws and the AKS.

168. The United States and State of Montana were unaware of the falsity of the records, statements, certifications, and claims made or caused to be made by Defendants. The United States and State of Montana paid claims that would not have been paid if they knew about Defendants' illegal conduct.

169. By virtue of the false records or false claims made by the Defendants, the United States and State of Montana suffered damages and are entitled to treble damages under the federal False Claims Act and Montana False

Claims Act respectively to be determined at trial.

170.   Additionally, the United States and State of Montana are entitled to civil penalties between $5,500 and $11,000 for each false claim made and caused to be made by Defendants arising from their illegal conduct.

## Count III--- Conspiring to Submit False Claims

171.   Relator repeats the allegations and statements contained in all of the preceding paragraphs as though fully set forth herein.

172.   In pertinent part, the federal False Claims Act and Montana False Claims Act establish liability for "any person who....conspires to commit a violation of subparagraph (A), (B), (D), (E), (F), or (G)."   31 U.S.C. § 3729(a)(1)(C); *see* Mont. Code Ann. § 17-8-403(1)(c).

173.   This is a claim for penalties and treble damages under the federal False Claims Act, 31 U.S.C. § 3729, *et seq.* and Montana False Claims Act, Mont. Code Ann. § 17-8-403, et seq.

174.   Through the acts described above, the Defendants acting in concert with each other and other contractors, agents, partners, and/or representatives, conspired to knowingly present or cause to be presented, false claims to the United States and State of Montana and knowingly made, used, or caused to be made or used, false records and statements, and omitting material facts, to get false claims paid or approved.

59

175. As a result, the United States and State of Montana were unaware of the false claims submitted and caused by the Defendants and the United States and State of Montana paid claims that would not be paid if the Defendants' illegal conduct was known to them.

176. By reason of Defendants' acts, the United States and State of Montana have been damaged in a substantial amount to be determined at trial.

177. By virtue of Defendants' conspiracy, the United States and State of Montana sustained damages and are entitled to treble damages under the federal False Claims Act and Montana False Claims Act respectively, to be determined at trial, plus a civil penalty of $5,500 to $11,000 for each violation.

**Count IV---Submission of Express and Implied False Certifications**

178. Relator repeats the allegations and statements contained in all of the preceding paragraphs as though fully set forth herein.

179. In pertinent part, the False Claims Act establishes liability for "any person who…knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." 31 U.S.C. § 3729(a)(1)(B); *see* Mont. Code Ann. § 17-8-403(1)(b).

180. Compliance with *Stark* laws and the AKS was an explicit condition of payment under federal and state health care programs.

60

181.   The Defendants knowingly made or caused to be made or used false certifications of compliance with *Stark* laws and the AKS.

182.   In reliance on such express and implied certifications, the United States and State of Montana made payments under federal and state health care programs respectively. If the United States and State of Montana had known that such certifications were false, federal and state payments would not have been made for each of the years in question.

183.   By virtue of the false records, false statements, and false certifications made or caused to made by the Defendants, the United States and State of Montana sustained damages and therefore are entitled to treble damages under the federal False Claims Act and Montana False Claims Act respectively, to be determined at trial, plus a civil penalty of $5,500 to $11,000 for each violation.

## Count V---Knowingly Causing and Retaining Overpayments

184.   Relator repeats the allegations and statements contained in all of the preceding paragraphs as though fully set forth herein.

185.   The federal False Claims Act and Montana False Claims Act also establish liability for any person who "knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government." 31 U.S.C. § 3729(a)(1)(G); *see* Mont. Code Ann. § 17-8-

61

403(1)(g). The False Claims Act defines "obligation" as "an established duty, whether or not fixed, arising from an express or implied contractual, grantor-grantee, or licensor-licensee relationship, from a fee-based or similar relationship, from statute or regulation, or from the retention of any overpayment." 31 U.S.C. § 3729(b)(3); *see also* Mont. Code Ann. § 17-8-402(7)

186. "An entity that collects payment for [Designated Health Services] that was performed pursuant to a prohibited referral must refund all collected amounts on a timely basis." 42 C.F.R. § 411.353(d).

187. "The OIG may impose a penalty, and where authorized, an assessment against any person…whom it determines…[h]as not refunded on a timely basis…amounts collected as the result of billing an individual, third party payor or other entity for a [DHS] that was provided in accordance with a prohibited referral as described in [42 C.F.R. § 411.353]." 42 C.F.R. § 1003.102(b)(9).

188. The Defendants have knowingly caused and retained overpayments from federal and state health care programs arising from Defendants' violations of the *Stark* laws and AKS addressed above.

189. By virtue of the Defendants' causing and retaining overpayments from the Medicare Program, the Medicaid Program, and other federal and

state health care programs, the United States and State of Montana sustained damages and therefore are entitled to treble damages to be determined at trial, plus a civil penalty of $5,500 to $11,000 for each violation.

### Count VI--- False Record to Avoid an Obligation to Refund

190. Relator repeats the allegations and statements contained in all of the preceding paragraphs as though fully set forth herein.

191. The federal False Claims Act and Montana False Claims Act also establish liability for any person who "knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government." 31 U.S.C. § 3729(a)(1)(G).

192. The Defendants knowingly made and used, or caused to be made or used, false records or false statements, i.e., the false certifications made or caused to be made by Defendants, to conceal, avoid, or decrease an obligation to pay or transmit money or property to the United States and the State of Montana.

193. By virtue of the false records or false statements made by the Defendants, the United States and State of Montana sustained damages and therefore are entitled to treble damages under the False Claims Act, to be determined at trial, plus a civil penalty of $5,500 to $11,000 for each violation.

194. Additionally, the United States and State of Montana are entitled to a civil penalty of between $5,500 and $11,000 for each false claim made or caused to be made by Defendants arising from their illegal conduct.

## Prayers for Relief

195. On behalf of the United States and State of Montana, Relator requests and prays that judgment be entered against the Defendants in the amount of the United States' damages and the State of Montana's damages, trebled as required by law, such civil penalties as are required by law, for a *qui tam* relator's share as specified by 31 U.S.C. §3730(d) and Montana Code Ann. § 17-8-410, for attorney's fees, costs and expenses as provided by 31 U.S.C. § 3730(d) and Montana Code Ann. § 17-8-411, and for all such further legal and equitable relief as may be just and proper.

**JURY TRIAL IS HEREBY DEMANDED.**

This 25th of April, 2018,

Paul Odegaard, Esq.
Odegaard Braukmann Law, PLLC
1601 Lewis Avenue, Suite 101
Billings, Montana
59102
(406) 640-4441
paul@oblawmt.com

**Lead Counsel**
Bryan A. Vroon, Esq. (Motion for *Pro Hac* Admission to be filed)

64

Georgia Bar No. 729086
Law Offices of Bryan A. Vroon, LLC
1380 West Paces Ferry Road Suite 2270
Atlanta Georgia 30327
(404) 441-9806
bryanvroon@gmail.com

Edward D. Robertson, Jr. (Motion for *Pro Hac* Admission to be filed)
Bartimus, Frickleton & Robertston
715 Swifts Highway
Jefferson City, MO. 65109
573-659-4454
chiprob@earthlink.ne

## Certificate of Service

This is to certify that I have this day served a copy of the Relator's

Complaint by depositing a true and correct copy of same by Certified Mail

in the United States Mail, postage prepaid, addressed as follows:

The Honorable Attorney General Jeff Sessions
Attorney General of the United States
Attention: Seal Clerk
United States Department of Justice
950 Pennsylvania Avenue NW
Washington, D.C.  20530-0001

The Honorable Kurt G. Alme
United States Attorney for the District of Montana
Attention: Seal Clerk
U.S. Attorney's Office
2601 2nd Ave N.
Suite 3200
Billings, MT 59101

The Honorable Tim Fox
Attorney General of the State of Montana

65

Office of the Attorney General
215 N Sanders, Third Floor
PO Box 201401 Helena, MT
59620-1401

Elizabeth A. Rinaldo
Senior Trial Counsel
United States Department of Justice
Civil Division, Commercial Litigation Branch
601 D. St. NW, Room 9134
Washington, DC 20004

Megan Dishong, Esq.
Assistant United States Attorney for the District of Montana
P.O. Box 8329
Missoula, MT 59807

This _25th_ day of April, 2018.

_____
Paul Odegaard